United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE BLACK,<br><br>    Plaintiff,<br><br>  v.<br><br>UNUM LIFE INSURANCE COMPANY<br>OF AMERICA,<br><br>    Defendant. | Case No. 22-cv-04378-AMO<br><br>**ORDER RE CROSS-MOTIONS FOR JUDGMENT**<br><br>Re: Dkt. Nos. 22, 23, 24, 25 |

   Before the Court are the parties' cross-motions for judgment. ECF 22, 23, 24, 25. The Court held a hearing on the matter on November 30, 2023. ECF 34. Having considered the parties' papers, the relevant legal authority, and the arguments advanced by counsel at the hearing on the matter, the Court **GRANTS** Defendant's motion for judgment and **DENIES** Plaintiff's cross-motion for judgment for the reasons set forth below, which constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## I.  INTRODUCTION

   This action arises out of Unum Life Insurance Company of America's denial of Leslie Black's claim for long term disability ("LTD") benefits under group insurance policy number 912658 (the "Unum Policy" or "Policy"). After exhausting her administrative remedies under the Employee Retirement Income Security Act of 1974 ("ERISA"), Black filed this action. ECF 1 ("Compl."). The complaint asserts one claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to recover LTD benefits under the Unum Policy. *Id.* ¶¶ 17-21. Unum filed an answer to the complaint on September 29, 2022. ECF 10. On March 14, 2023, Unum filed the administrative record. ECF 20 ("AR"). On April 3, 2023, the parties filed simultaneous opening

trial briefs.[1]  ECF 22, 23.  The parties' responsive briefs followed on May 1, 2023.  ECF 24, 25.  On agreement of the parties, *see* ECF 28 at 4, the Court treats these briefs as motions for judgment pursuant to Federal Rule of Civil Procedure 52.  The Court held a hearing on the matter on November 30, 2023.  ECF 34.

The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a)(1), which provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Rodriguez v. Barrita, Inc.*, 62 F. Supp. 3d 936, 938 n.1 (N.D. Cal. 2014) (alterations in original; internal quotations and citation omitted).

## II.     FINDINGS OF FACT

### A.     Relevant Coverage Provisions

The Unum Policy's LTD disability plan provides benefits to "[a]ll full-time employees of Aetna Inc.,[2] excluding employees under a collective bargaining arrangement and those deemed ineligible, in active employment in the United States with the Employer[,]" for the plan year beginning "January 1, 2020 to June 1, 2020 and each following June 1 to June 1[.]"  AR at 941.

///

///

///

///

///

///

---

[1] With its opening brief, Unum filed a request for judicial notice of documents pertaining to an argument Black raised during the claims review process.  ECF 22-1.  Because Black has not raised that issue in briefing filed in this Court, the request for judicial notice is **DENIED AS MOOT.**

[2] Aetna hired Black as an Account Director on September 30, 2019.  AR at 31.

The Unum Policy contains the following provision defining disability:

### HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

- you are **limited**[3] from performing the **material and substantial duties**[4] of your **regular occupation**[5] due to your sickness or injury; and
- you have a 20% or more loss in your **indexed monthly earnings**[6] due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation**[7] for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice.  Unum will pay for this examination.  We can require an examination as often as it is reasonable to do so.  We may also require you to be interviewed by an authorized Unum Representative.

*Id.* at 950 (bold in original).

---

[3] The plan defines "limited" as "what [the employee] cannot or [is] unable to do." *Id.* at 964.

[4] "Material and substantial duties" are duties that "are normally required for the performance of [the employee's] regular occupation" and "cannot be reasonably omitted or modified." *Id.*

[5] An employee's "regular occupation" is "the occupation [the employee is] routinely performing when [their] disability begins.  Unum will look at [the employee's] occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.* at 966.

[6] "Indexed monthly earnings" are the employee's "monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index." *Id.* at 964.

[7] The term "gainful occupation" "means an occupation that is or can be expected to provide [the employee] with an income within 12 months of [their] return to work, that exceeds: 80% of [the employee's] indexed monthly earnings, if [they] are working; or 60% of [the employee's] indexed monthly earnings, if [they] are not working." *Id.* at 963.  Because Unum made its benefit determination based on whether Black could perform the duties of her regular occupation, it did not reach the question of whether Black could not perform the duties of any occupation.  *See* ECF 24 at 8.

The plan "does not cover any disabilities caused by, contributed to by, or resulting from . . . [a] pre-existing condition."[8]  *Id.* at 957-958.  The following provision addresses pre-existing conditions:

### WHAT IS A PRE-EXISTING CONDITION?

You have a pre-existing condition when you apply for coverage when you first become eligible if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and
- the disability begins in the first 12 months after your effective date of coverage.

In addition, this plan will not cover an increase in your coverage made at an annual enrollment period or change in status if you have a pre-existing condition.  You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to the date your coverage increased; and
- the disability begins in the first 12 months after your coverage increased.

*Id.* at 958.  The Unum Policy took effect January 1, 2020.  *Id.* at 1715.  Based on that effective date, the three month look-back period under the Policy ran from October 1, 2019 through December 31, 2019.  *Id.*

///

///

///

///

///

///

///

---

[8] While Black contends that the award of STD benefits constitutes a concession that she is disabled, *see* ECF 23 at 22, the STD benefit under the prior Aetna plan did not, as do the relevant LTD provisions applicable here, contain a pre-existing condition limitation.  AR at 1614-1617.

The plan also contains a continuity of coverage provision,[9] which provides:

> ***WHAT IF YOU HAVE A DISABILITY DUE TO A PRE-EXISTING CONDITION WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)***
>
> Unum may send a payment if your disability results from a pre-existing condition if, you were:
>
> - in active employment and insured under the plan on its effective date; and
> - insured by the prior policy at the time of change.
>
> In order to receive a payment you must satisfy the pre-existing condition provision under:
>
> 1. the Unum plan; or
> 2. the prior carrier's plan, if benefits would have been paid had that policy remained in force.
>
> If you do not satisfy Item 1 or 2 above, Unum will not make any payments.

*Id.* at 959.

Under the prior Aetna LTD plan,[10] a pre-existing condition would make an employee ineligible for LTD benefits as set forth in the following provision:

> **Pre-existing condition limitation**
> You will not be eligible for LTD benefits if you become disabled before LTD coverage begins or during the first 12 months you are covered by the plan if, within three months before your LTD coverage began:
>
> - The cause of your disability was diagnosed or treated
> - You received services for the illness or injury
> - You took drugs or medicines prescribed or recommended by a doctor for that condition

*Id.* at 1621.  Under this Aetna plan, effective December 1, 2019, the three month look-back period ran from September 1, 2019 through November 30, 2019.  *Id.* at 1715-1716.

///

---

[9] There is no dispute that the continuity of coverage provision applies to Black.  ECF 22 at 22; ECF 23 at 4.

[10] The prior Aetna plan was administered by the Hartford.  AR at 1624.

United States District Court
Northern District of California

1

### B.    Overview of Black's Claim for LTD benefits

On January 29, 2020, Black fell at a yacht club. *Id.* at 20. She sustained a Type 1 non-displaced clavicle fracture. *Id.* at 125. She also hit her head. *Id.* at 21. On February 13, 2020, Black called Unum to initiate a disability claim based on neck and shoulder pain, a broken collarbone, and a head injury.[11] *Id.* at 20-21, 37. Unum approved Black's claim for short term disability ("STD") benefits from January 30, 2020 through February 15, 2020,[12] noting January 29, 2020 as Black's last day of work, January 30, 2020 as the date of disability, with benefits beginning February 6, 2020, initially approved through February 15, 2020. *Id.* at 77. Benefits were extended through "the maximum duration of [Aetna's] 26 week plan." *Id.* at 638. By letter dated August 21, 2020, Unum notified Black that her STD benefits would end on August 20, 2020. *Id.* The letter stated "[y]our claim is approaching a point where Short Term Disability benefits will end and your claim will be considered for benefits under the Long Term Disability plan." *Id.*

Unum then commenced its LTD claims investigation. *Id.* at 1421-1424. Because Black's claimed disability arose within the first 12 months of her LTD coverage under the Unum Policy, Unum evaluated whether the claimed disabling conditions were excluded, in whole or in part, by the Policy's pre-existing condition limitation. *Id.* at 1715.

Unum ultimately determined that Black's neck and shoulder conditions were pre-existing, and therefore not covered, and found no disability stemming from the collarbone or head injuries. *Id.* at 6338-6341. Unum therefore denied her LTD claim. *Id.* at 6341. Black appealed. *Id.*. Unum upheld its benefit determination on appeal, finding that Black received treatment for "left

---

[11] The claim document in the record describes the medical condition on which the STD claim is based as follows: "she had a very bad accident / she had a very bad fall accidentally / she bl[a]cked out and she got a shoulder strain, she also hit her hip and head really hard and she landed on her elbow / she slipped on tile[] floor / it wasn't [*sic*] happened at work." *Id.* at 20-21.

[12] The LTD benefit is subject to an elimination period that is the later of 180 days or the date STD payments end. *Id.* at 942.

United States District Court
Northern District of California

shoulder adhesive capsulitis,[13] Ehler's Danlos Syndrome (EDS),[14] left shoulder pain/stiffness/weakness, lumbar sprain, perennial allergic rhinitis, adrenal insufficiency, chronic rhinosinusitis, difficulty conceiving, nasal congestion, neck/cervical pain, deviated nasal septum, acute recurrent sinusitis, thoracic pain, and scoliosis" during the three month look back period under each plan. *Id.* at 6339. Unum determined that the left fractured clavicle and post-concussive syndrome were not pre-existing but nonetheless determined that those conditions were not disabling. *Id.* at 6340-6341.

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard

In this matter, a de novo standard of review applies.[15] "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that [they are] disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits . . . ." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

"When a district court reviews de novo a plan administrator's determination of a claimant's right to recover long term disability benefits, the claimant has the burden of proving by a preponderance of the evidence that [they were] disabled under the terms of the plan." *Armani v.*

---

[13] Neither party explained these conditions. "Frozen shoulder, also called adhesive capsulitis, involves stiffness and pain in the shoulder joint. Signs and symptoms typically begin slowly, then get worse. Over time, symptoms get better, usually within 1 to 3 years. Having to keep a shoulder still for a long period increases the risk of developing frozen shoulder. This might happen after having surgery or breaking an arm." *See* https://www.mayoclinic.org/diseases-conditions/frozen-shoulder/symptoms-causes/syc-20372684 (last visited Aug. 12, 2025).

[14] "Ehlers-Danlos syndrome is a group of inherited disorders that affect your connective tissues — primarily your skin, joints and blood vessel walls. Connective tissue is a complex mixture of proteins and other substances that provide strength and elasticity to the underlying structures in your body." *See* https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125 (last visited Aug. 12, 2025).

[15] The parties agree this is the appropriate standard of review. ECF 14 at 5; ECF 28 at 5. They also agree that the scope of the Court's review is limited to the administrative record. ECF 28 at 5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-1163 (9th Cir. 2016) (citing *Muniz*, 623 F.3d at

2    1294).  The insurer "has the burden of showing an exclusion applies."  *Dowdy v. Metro. Life Ins.*

3    *Co.*, 890 F.3d 802, 810 (9th Cir. 2018) (citation omitted).  "The burden of proof is preponderance

4    of evidence."  *See Wise v. MAXIMUS Fed. Servs., Inc.*, 478 F. Supp. 3d 873, 887 (N.D. Cal. 2020)

5    (citations omitted).  Exclusions are "construed narrowly" "[u]nder general principles of insurance

6    law[,]" *Dowdy*, 890 F.3d at 810, and any ambiguities in the policy are construed against the

7    insurance company.  *Lang v. Long-Term Disability Plan Sponsor of Applied Remote Tech., Inc.*,

8    125 F.3d 794, 799 (9th Cir. 1997).

9        **B.    Analysis**

10       Because Black indicated at oral argument that her LTD claim "is more grounded in the

11   shoulder problem" and her neck pain, *see* ECF 39 at 9:13-14; *see also id.* at 39:33 (The

12   postconcussive syndrome is "not the basis of the claim past the elimination period.  The lingering

13   problems here are this neck pain, which is quite severe, and the shoulder dysfunction, which

14   affects her entire dominant arm.") & *id.* at 33:22-23 ( "[The] current claim is not grounded in the

15   clavicle.  The clavicle did heal."), the Court focuses its analysis accordingly.  Centered on the neck

16   and shoulder injuries that ground Black's LTD claim, the Court first examines whether pre-

17   existing condition limitation in the Unum Policy precludes coverage.

18           **1.    <u>Whether Black's neck and shoulder problems were pre-existing under
                      the Unum Policy.</u>**

19

20       The Unum Policy "does not cover any disabilities caused by, contributed to by, or resulting

21   from . . . [a] pre-existing condition."[16]  AR at 957-958.  The pre-existing condition exclusion

22   applies where the claimant "received medical treatment, consultation, care or services including

23   diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to [the

24   claimant's] effective date of coverage; and the disability begins in the first 12 months after [the

25   claimant's] effective date of coverage."[17]  *Id.* at 958.  Because there is no dispute that Black's

26

27   ───────────────
     [16] The STD benefit under the prior Aetna plan did not contain a pre-existing condition limitation.
     AR at 1614-1617.

28   [17] Black does not dispute that this language is conspicuous, which means "recovery could be

disability began in the first 12 months after Black's effective date of coverage, *see* ECF 23 at 6 ("Black first became disabled within the meaning of the Plan on January 30, 2020, when she ceased working after sustaining injuries in a fall."); ECF 22 at 6 ("Black's "claimed disability arose within the first 12 months of her Unum LTD coverage . . . ."), the Court analyzes whether Black "received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to [her] effective date of coverage." *See id.* at 958. For this analysis, the relevant three month look back period under the Unum Policy, which took effect January 1, 2020, ran from October 1, 2019 through December 31, 2019. *Id.* at 1715. Under the prior Aetna plan, effective December 1, 2019, the relevant three month look back period ran from September 1, 2019 through November 30, 2019. *Id.* at 1715-1716.

During the relevant look back periods, Black received extensive medical treatment, consultation, care or services for neck and shoulder issues.[18] Treatment notes from a September 20, 2019 visit to Dr. Jo Marie Munnich, Black's primary care physician, indicate that Black was stressed about having two pending job offers and wanted Dr. Munnich to advise if she could "handle either option due to . . . episodes of shoulder pain and neck pain[.]" *Id.* at 2495. Under

_____

barred if a preexisting condition substantially contributed to the loss, even though the claimed injury was the predominant or proximate cause of the disability." *See Dowdy*, 890 F.3d at 808 (internal quotations and citation omitted); *see also Earle v. Unum Life Ins. Co. of Am.*, No. 20-55868, 2021 WL 4871785, at *1 (9th Cir. Oct. 19, 2021) ("Because the exclusionary provision in Unum's AD&D Plan is conspicuous, the district court did not err in applying the 'substantial contribution,' rather than the 'proximate cause,' standard.") (citation omitted).

[18] Beyond the relevant look back periods, the Court notes that Black has been treated for scoliosis for over 20 years. AR at 2527. She was involved in a ski accident in 1996 that led "to cervical spine stenosis, which lead to radiculopathy, especially involving her left shoulder." *Id.* at 3006 (capitalization and spacing cleaned up). "There was an eventual workup for potential thoracic outlet syndrome," and Black "[e]ventually had cervical spine surgery done with Dr. Brian Andrews in 2014." *Id.*; *see also id.* at 2416 (indicating that Dr. Andrews opined the accident caused 'permanent c-spine damage and possible TOS left shoulder.' "). She "had only [a] partial response" to the right-sided cervical spine surgery completed in September 2014. *Id.* at 2655, 3033. She suffered a fall in 2010 on an outstretched arm. *Id.* at 2655. In 2018, Black had a massage that injured her shoulder, resulting in acute pain and adhesive capsulitis for which she received physical therapy. *Id.* at 2655, 2676. The same year, she was diagnosed with a degenerative spine condition and multiple tears of her left rotator cuff and labrum. *Id.* at 3033, 3074-3075, 3973-3974.

United States District Court
Northern District of California

1    "Assessment & Plan," cervical radiculopathy[19] is listed, with a note that reads "may be able to

2    handle working again if able to devise safe ergonomics in the workplace, at home and avoid

3    working while commuting." *Id.* Notes from an October 11, 2019 office visit state that Black

4    "needs letter for new employer specifying that she cannot lift new equipment into her apartment

5    up huge fleight [*sic*] of stairs caused back and shoulder pain to flare." *Id.* at 2540. The

6    "Assessment & Plan" section lists "[a]dhesive capsulitis of shoulder, left shoulder" and "[l]umber

7    sprain." *Id.* In notes from an October 25, 2019 visit, that section lists "[a]dhesive capsulitis of

8    shoulder, left shoulder" and neck pain, among issues. *Id.* at 2541. Dr. Munnich also noted

9    Black's history of "marked limitations in using neck and shoulders." *Id.*

10    A December 20, 2019 letter from Dr. Munnich states: "[p]lease be extremely gentle with

11    manipulation of Leslie's jaw and neck; she has EDS [Ehlers-Danlos Syndrome], and her

12    ligaments are lax and prone to injury and dislocation." *Id.* at 2235. Treatment notes from the

13    same day indicate "cervical radiculopathy [s]ymptoms getting worse[.]" *Id.* at 2236. Dr. Munnich

14    summarized Black's subjective complaints as follows: "[n]eeds MRI [to] check how bad off our

15    [*sic*] her cervical discs, impingement on her nerve roots[;]" "[n]eeds me to fill out form specifying

16    her degrees of limitation due to her cervical disks compression on her nerves causing her chronic

17    pain[.]" *Id.* (capitalization and spacing errors cleaned up). The "Assessment & Plan" section of

18    that day's notes state, under "Cervical radiculopathy," "[r]efer to Dr. Yeoungjun Kim Golden Gate

19    Spine for consult about possible surgery[,]" "[c]annot tolerate getting anymore epidural injections

20    as they are giving her steroid induced psychosis[,]" "[f]illed out form for her work specifying her

21    limitations due to her chronic pain and limited range of motion due to cervical spondylosis[,]"

22    "[o]rder MRI for surgical consult, likely will be having surgery[,]" "[p]rescription for Valium to

23    take for claustrophobia for MRI[,]" "[h]ad X-ray and CT scan of neck February 2019." *Id.*

24    (capitalization and spacing errors cleaned up).

25

26

27    ───────────

19 "Cervical radiculopathy, commonly called a 'pinched nerve,' occurs when a nerve in the neck is
compressed or irritated where it branches away from the spinal cord. This may cause pain that
28    radiates into the shoulder and/or arm, as well as muscle weakness and numbness." *Id.* at 6388.

United States District Court
Northern District of California

1    Physical therapy notes from October 9, 2019[20] list Black's medical diagnosis as

2    "(L) adhesive capsulitis; h/o Erhler's [*sic*] Danlos Syndrome – Type III, Laterality: L." *Id.* at

3    2539.  The treatment diagnosis section reads "(L)shoulder pain/stiffness/weakness." *Id.*  Under

4    "Precautions/Special Needs," the notes state:  (+) Erhler's [*sic*] Danlos Syndrome – type III;

5    Chronic pain in neck/LB . . . (2001) (L) RC injury falling with L arm backwards." *Id.*  The

6    provider's summary of Black's subjective complaints, reads, in pertinent part "[m]y neck is

7    hurting due to my scoliosis and my L shlder [*sic*] is still hurting due to my shlder [*sic*] injury." *Id.*

8    Black was concerned about being unable to carry heavy office equipment between her home and

9    her office, which her employer expected.  *Id.*  She feared she would not be able to keep the job.

10    *Id.*

11    Notes from Lenny Stein, D.C., a chiropractor who treated Black "for over 20 years for

12    scoliosis and related issues," indicate that, on September 13, 2019, Black was stressed about

13    having two job offers, one of which would require travel.  *Id.* at 2527, 2528.  She reported left low

14    back pain and cramping and sacral pain.  *Id.* at 2528.  On September 27, 2019, Black received

15    "soft tissue work on upper cervical region."  *Id.*  On November 5, 2019, Black experienced a

16    "severe flare up of pain on cervical spine," which caused her to sleep in a cervical collar.  *Id.*  The

17    notes from that day also indicate that the ergonomics and lifting requirements of her new job were

18    "too challenging for her neck problems.  Head is flexed to see laptop on desk."  *Id.*  Notes from a

19    November 20, 2019 visit indicate "some pain and limitations @ shoulder."  *Id.* at 2530.  On

20    December 3, 2019, Black indicated sitting through "2 long difficult sessions of dental work,"

21    which "resulted in acute neck pain."  *Id.*  Notes from a subsequent visit on December 11, 2019

22    indicate that "aggressive dental work further aggravated cervical neck issues[.]"  *Id.*  Notes from a

23    December 24, 2019 visit state that Black's symptoms are "indicative of acute radiculopathy and

24    compression[.]"  *Id.* at 2531.

25    MRIs completed outside the relevant look back periods support the existence of the

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [20] The notes indicate that visit 21, which was to take place on October 9, 2019, was cancelled.  It

28    appears that the physical therapy provider nonetheless documented a plan of care, due October 9,
      2019, which includes the above notes.  *Id.* at 2539.

United States District Court
Northern District of California

medical conditions documented in the above treatment notes.  An MRI of the rotator cuff and shoulder regions completed on June 22, 2020 notes "mild to moderate cuff tendinosis supraspinatus tendon and mild to moderate tendinosis infraspinatus tendon" and "improvement of previously documented fluid collection adjacent to the infraspinatus tendon and subacromial bursa in 2019."  *Id.* at 3035.  The MRI also indicates "[s]carred appearance of the posterior superior to posterior inferior which is nondisplaced.  This should be correlated with any component of posterior instability on clinical exam.  There is minimal posterior subluxation of the humeral head relative to the glenoid fossa.  These changes may have progressed compared to October 2018 with respect to the posterior labrum."  *Id.*; *see also id.* at 3036.  In addition, the MRI results state "[t]here is abnormal morphology of the anterior inferior labrum which may correlate for anterior inferior labral tear.  The appearance of the anterior labrum has more irregular morphology compared to previous study of 10/26/18.  There is thinning of articular cartilage mid to posterior glenoid.  No Hills-Sachs lesion is seen."  *Id.* at 3035.

An MRI completed July 27, 2020 showed the following impressions:

> 1. No change in the Straightening of the cervical lordosis may represent muscle spams and/or cervical strain.
> 2. No change in the 2mm C6-7 degenerative retrolisthesis with right hemilaminectomy change.
> 3. Progression C6-7 Central/right paracentral disc protrusion with relatively mild central stenosis.
> 4. Severe left C5-6 and C6-7 foraminal stenosis due to asymmetric uncinate and facet hypertrophy.  This is best appreciated on sagittal images 3.

*Id.* at 3074-3075.

With respect to the 2018 MRI referenced in the imaging completed in 2020, Dr. Munnich noted Black "had an MRI in the fall of 2018 of her left shoulder that showed multiple tears of her rotator cuff tendons and labrum."  *Id.* at 3033 (capitalization and spacing cleaned up).  Another physician treating Black, Dr. Rakesh Donthineni, stated the following with respect to the June 2020 MRI: "[t]he report . . . is notable for moderate rotator cuff tendinosis as well as labrum changes, which appear to be degenerative changes."  *Id.* at 3910.  He recommended a "[c]ervical spine MRI to evaluate for any stenosis, since the symptoms seem to be a persistent radiculopathy."  *Id.* at 3911.

United States District Court
Northern District of California

Having considered the above medical evidence, the Court finds that Black received medical treatment, consultation, care or services during the applicable look back periods for the following conditions:  left shoulder adhesive capsulitis, Ehlers-Danlos Syndrome, scoliosis, cervical radiculopathy, left shoulder pain, stiffness, and weakness, and chronic neck/cervical and thoracic pain.

To the extent Black disputes that left shoulder pain, stiffness, and weakness, chronic neck, cervical, and thoracic pain are symptoms as opposed to conditions, that is a distinction without a difference, where, as here, Black's symptoms are consistent with the conditions that were diagnosed and treated during the look back period.  *Cf. McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618, 625 (3d Cir. 2004) (concluding that treatment for symptoms related to multiple sclerosis could not trigger pre-existing condition limitation where the claimant had not yet been diagnosed with multiple sclerosis).

Black's argument notwithstanding, the Court finds that the disability for which Black seeks LTD benefits was "caused by, contributed to by, or result[ed] from" these pre-existing conditions.[21]  The effect of these conditions on Black's neck and shoulder cannot be dismissed "as merely related to the injury" she suffered as a result of the fall in January 2020.  Rather, they are a "substantial catalyst" for the exacerbation and recurrence of conditions she has suffered from during the relevant look back periods and even decades prior.  These conditions therefore substantially contributed to the neck and shoulder issues that ground Black's LTD claim.  *See Estate of Maurice v. Life Ins. Company of N. Am.*, 792 F. App'x 499 (9th Cir. 2020) (holding that diabetes substantially contributed to claimant's leg amputation where the condition, which was extensive and documented, prevented cuts from healing properly and exacerbated the risk of

---

[21] Black argues that to the extent her fall exacerbated her pre-existing conditions, that exacerbation would fall outside the scope of the Unum Policy pre-existing condition limitation.  But that argument reads out the language in the provision that is least favorably to Black.  She cannot avoid the conclusion that the ailments giving rise to her LTD claim were "caused by, contributed to by, or result[ed] from" her pre-existing conditions by restyling them as exacerbated.  To the extent Black's pre-existing conditions were exacerbated by the fall, they necessarily "contributed to" the impairments she now claims are disabling.  In light of the administrative record that exists here, and the specifics of this case, to conclude otherwise would effectively gut the specific pre-existing condition limitation in this Unum Policy altogether.

infection); *cf. Dowdy*, 980 F.3d at 811 (finding for claimant where insurer did not show that diabetes substantially caused or contributed to the insured's loss as the record with respect to the role of diabetes in the claimant's recovery was "notably thin").  Accordingly, these pre-existing conditions preclude an award of LTD benefits under the Unum Plan.

The Court also finds that Black "took prescribed drugs or medicines in the 3 months just prior to [her] effective date of coverage."  Notes form a December 20, 2019 visit to Dr. Munnich state Black "[c]annot tolerate getting anymore epidural injections as they are giving her steroid induced psychosis[,]" suggesting Black received epidural injections in the time prior to December 20, 2019, likely between the relevant look back period of October 1, 2019 through December 31, 2019.  *See* AR at 2236.  In addition, notes from a November 5, 2019 visit to Chiropractor Stein indicate Black was taking diclofenac.[22]  *Id.* at 2528.  Black's prescription history also shows that she received oxycodone/acetaminophen for pain during the relevant look back period.  *See id.* at 1428-1457.  Based on the quantities prescribed and the number of times these medications were refilled, the Court finds not only that they were prescribed, but that Black took them for neck and shoulder pain.  *See id.* at 3160 (20 pills of hydrocodone/acetaminophen prescribed on November 6, 2019 and again on November 8, 2019); *id.* at 3161 (two prescriptions for 30-day supply of diclofenac prescribed on August 26, 2019).  Black's use of these medications is further supported by treatment notes from medical visits that took place outside the relevant look back period. Black continued or resumed using hydrocodone and diclofenac after her January 2020 fall, though Dr. Munnich noted that Black's pain was "only minimally alleviated" with the combination of mediations she was taking.  *Id.* at 3033 (listing hydrocodone, cyclobenzaprine muscle relaxer, and diclofenac anti-inflammatory).  This medication history would satisfy the second prong of the Unum Policy's pre-existing condition limitation.  *See id.* at 958 ("You have a pre-existing condition when you apply for coverage when you first become eligible if: []you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or

---

[22] "Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild-to-moderate pain, and helps to relieve symptoms of arthritis (eg, osteoarthritis or rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain."  *See* https://www.mayoclinic.org/drugs-supplements/diclofenac-oral-route/description/drg-20069748 (last visited Aug. 12, 2025).

United States District Court
Northern District of California

medicines in the 3 months just prior to your effective date of coverage.").

Though they do not compel a different outcome under the preponderance of the evidence standard applicable here, the Court briefly addresses the limited portions of the record that seem to favor Black but go against the overwhelming weight of the medical evidence discussed above.

A letter from Allen D. Bott, who examined Black once for a nerve study ordered by Black's shoulder surgeon, Dr. Isono, interpreted July 2020 MRI results as "normal" and "showing "no electrical evidence for a left cervical radiculopathy" but noted concerns that Black was "developing a Chronic Pain Syndrome (i.e. central sensitization)[.]" *Id.* at 2524; *see also id.* at 2656 (referencing referral for nerve study). Dr. Bott did not explain the basis for his interpretation and is contrary to the multiple references in the record about diagnosed and persistent radiculopathy. Indeed, Dr. Isono noted the Black experienced "a significant exacerbation of her left cervical radiculopathy" that made the anesthesiologist on Black's medical team concerned about proceeding with a surgery as initially scheduled. *Id.* at 2677.[23]

In a letter dated September 27, 2020, Dr. Munnich stated:

> [Black's] episode of frozen shoulder (adhesive capsulitis) that was treated in 2019 is a separate and distinct episode from the fracture of her clavicle that she sustained in January 2020 after a traumatic fall. Her physical therapy session to treat her frozen shoulder were completed August 20, 2019. Her physical therapist formalized the conclusion of her physical therapy with [a] final range of motion assessment in October of 2019.

*Id.* at 2645. Because Black indicated her claim is not based on the fractured clavicle, the Court does not reach the question of whether the collarbone was independently disabling, and the Court has not considered Dr. Munnich's assessment of the connection between the broken collarbone and the pre-existing shoulder condition.

A letter from Dr. Munnich to Unum, dated October 14, 2020, reads:

> This letter is to clarify that the injuries sustained on January 29, 2020 are new and different from injuries Ms. Black suffered from prior to her traumatic fall in January 2020.

---

[23] When Dr. Isono performed the rescheduled surgery, he did not proceed with a "formal and direct labral repair" due to "the presence of severe adhesive capsulitis." AR at 2679. He diagnosed Black's labral tear as degenerative. *Id.* at 2682.

Her traumatic fall in January 2020 resulted in new and different injuries. During her accidental fall in January 2020, she landed on hard cement tile on her left shoulder. She sustained whiplash injury to [her] neck, struck her shoulder and elbow on cement tile. Her left arm was jammed up into her shoulder socket. It is presumed to have been dislocated and then popped back in on its own.

There was delay in her getting appropriate treatment after her fall because of SIP [shelter-in-place] that started right after her fall.

UCSF Orthopedic surgeon Dr. Ma did not arrange follow up for months after her first appointment with him in early February. Her injuries were so severe that [they] ultimately led to her moving in with a friend to be full time care giver, driving her to all appointments. She had to make 2 hour drives to obtain medical treatments because treating physicians and physical therapists were an hour's drive away. Riding in a car worsened her shoulder and neck pain.

Initial physical therapy ended in June due to delay in starting because of COVID SIP.

First MRI study was done in July.

The brace she was supplied turned out to be contraindicated in the kind of injuries she sustained.

She now believes that the PT exercises that the physical therapist had her do were actually contraindicated for the kind of injury she had and that she should not have been doing light weights. She has just been seen by the lead PT at John Muir Medical Center PT and he said that her MRI shows severe injury.

Ms. Black's medical visits and treatments for shoulder and neck pain prior to her fall were different in location and type of pain than pain resulting after her fall. The newer pain is an intense nerve pain in [her] left arm and left side of neck.

She had previously had surgery with Dr. Andrews in 2014 to reduce chronic pain in the right side of her neck. Her discectomy was successful, and she did not have right sided neck pain after that. The recent surgery with Dr. Andrews on August 31, 2020 was to address left sided neck pain. This surgery involved 2 level laminotomies C5-C6, C6-C7.

Currently Dr. Andrews has directed her not to do any PT until 6-12 weeks post-op, and to get established with a very good shoulder specialist to supervise care and rehab of [her] shoulder.

Ms. Black wants it to be clear in her records that the precautionary limits I recommended for her to be used for work limitations in her new job were guidelines and not actual limitations.

*Id.* at 2643. Dr. Munnich's letter does not sufficiently explain how the location and type of pain

are different given the extensive symptoms documented in the record affecting Black throughout

the relevant look back periods and beyond.  Nor are they consistent with her own treatment

records, which previously indicated Black had "only [a] partial response" to the 2014 surgery and

that the fall "[c]aused exacerbation of chronic pain of scoliosis, [and] cervical spinal stenosis."  *Id.*

at 3033.

A March 10, 2021 letter from Chiropractor Stein reads:

> This will verify that the above patient has been under my care for over 20 years for scoliosis and related issues.
> On 1/29/20, she sustained multiple serious injuries when she fell on a wet, unmarked tile floor at the St. Francis Yacht Club.  She had multiple injuries, including a fractured left clavicle, major trauma to her left shoulder including a torn labrum, injury to the rotator cuff and trauma to multiple related structures.  In addition, she sustained injuries to the cervical spine that required cervical spine surgery with Brian Andrews, MD, neurosurgeon.  The combined effect of her injuries caused disability that remains to this day.
> She called me for advice the morning after her call and upon hearing of her symptoms, I was highly concerned and said she needed to see an orthopedic specialist or go to an emergency room.  Her injuries were, in fact, of significant magnitude.
> She had been seen in my office earlier that same day, 1/29/20.  At that time, she had actually commenced a gentle strengthening gym program and was beginning a new program of well-being and strength.  She did not have any of the above described injuries.  She was seen for the usual issues and musculoskeletal strains we had treated her for in the past.  The serious and multiple injuries to her clavicle, shoulder and cervical spine described above were the direct and proximate result of the fall sustained at the Yacht Club that evening.

AR at 2527.  Notably, the letter does not indicate that "the usual issues and musculoskeletal

strains" for which he had been treating Black over the course of 20 years were resolved or that

they could not have possibly contributed to the injuries Black sustained as a result of the fall.

Chiropractor Stein opines that Black's disabling injuries were the "direct and proximate result of

the fall," but "recovery c[an] be barred if a preexisting condition substantially contributed to the

loss, even though the claimed injury was the predominant or proximate cause of the disability."

*Dowdy*, 890 F.3d at 808 (internal quotations and citation omitted).

Similarly, a letter from Chiropractor Stein of August 12, 2021 focuses on whether the

injuries Black sustained from the fall were disabling but does not rule out that Black's pre-existing

conditions contributed to her claimed disabling condition:

17

> I have reviewed your letter dated July 30, 2021, asking my opinion whether two look back periods, 9/1/19-11/30/19 and 10/1/19-12/31/19 rendered [Black] disabled and were exacerbated by her fall on 1/29/20.
>
> She has been under my care for scoliosis and, at times, issues regarding her shoulder and cervical spine. I reviewed my records for the months preceding her fall on 1/29/20 and during the above noted look back periods. Although she had some symptoms in those areas, she was nevertheless working full time despite burdensome conditions at work. She was attending her job with no lost time. Her cervical and shoulder issues were responding to a gym program and conservative care and were not causing disability that would preclude her from work or render her disabled.
>
> The fall on 1/29/20 unequivocally caused new and serious injuries to her shoulder, cervical spine and concussive issues that were absolutely disabling. Her fall caused such substantial injuries to her cervical spine and shoulder girdle that the care which had successfully managed her scoliosis is no longer effective and techniques that were beneficial can no longer be attempted due to her new vulnerability and damages. Absent the fall on 1/29/20, any prior issues would not have sufficient to render her disabled or unable to go to work. Had they been disabling she would have been advised to cease working and thus was neither indicated nor necessary by me as her caregiver prior to her fall on 1/29/20.

*Id.* at 3949.

Dr. Isono's opinion is similar:

> In terms of the evolution of her pathology, I believe that the fall led to the subluxation of the glenohumeral joint and the labral tear. She then developed a secondary adhesive capsulitis with severe scarring of the capsule as well as the subacromial space. The labral tear, which was a result of her fall, has healed in the medial position, and it will be determined if this position will be appropriate to give her stability for her shoulder. If not, a labral reconstruction may be considered for the future.

*Id.* at 2688.

While the above portions of the record purport to attribute the January 2020 fall as the "predominant or proximate" cause of the neck and shoulder issues that ground Black's LTD claim, the preponderance of medical evidence in the record compels a finding that Black's pre-existing conditions substantially contributed to those neck and shoulder issues, precluding an award of LTD benefits. Put simply, notwithstanding Black's contention that her pre-existing neck and shoulder issues were improving prior to her January 2020 fall, the evidence in the record

18

establishes, more likely than not, that those conditions would have persisted even if she had not suffered a fall in January 2020.  *See Walker Earle v. UNUM Life Ins. Co. of Am.*, No. CV 19-2903-JFW(AFMX), 2020 WL 4434951, at *14 (C.D. Cal. July 23, 2020), *judgment entered sub nom. Earle v. Unum Life Ins. Co. of Am.*, No. 219CV02903JFWAFMX, 2020 WL 4429574 (C.D. Cal. July 30, 2020), and *aff'd sub nom. Earle v. Unum Life Ins. Co. of Am.*, No. 20-55868, 2021 WL 4871785 (9th Cir. Oct. 19, 2021) (finding that a pre-existing condition – vitreomacular traction ("VMT") – substantially contributed to the plaintiff's loss of sight where she "could have developed a macular hole even if she had not tripped on the stairs" and "would not have developed a macular hole in her right eye simply by tripping up the stairs, even if her fall was as severe as she described it, if she had not had VMT in her right eye prior to the fall.").  The Court now turns to whether the pre-existing condition limitation in the Aetna plan also bars an award of those benefits.

### 2. Whether Black's neck and shoulder problems were pre-existing under the Aetna plan.

The pre-existing condition limitation in the Aetna plan reads:

> You will not be eligible for LTD benefits if you become disabled before LTD coverage begins or during the first 12 months you are covered by the plan if, within three months before your LTD coverage began:
>
> - The cause of your disability was diagnosed or treated
> - You received services for the illness or injury
> - You took drugs or medicines prescribed or recommended by a doctor for that condition

AR at 1621.  Given the plan's effective date, December 1, 2019, the relevant three month look back period ran from September 1, 2019 through November 30, 2019.  *Id.* at 1715-16.

As a preliminary matter, the above provision does not specify whether any single criterion is sufficient to trigger the exclusion or whether all must be met.  The Court construes the provision as requiring all elements for two reasons.  First, exclusions must be construed narrowly.  *See Dowdy*, 890 F.3d at 810.  Second, "[a]mbiguities in ordinary insurance contracts are construed against the insurance company."  *See Lang*, 125 F.3d at 799.  With this in mind, the Court addresses each element in turn.

First, the cause of the neck and shoulder issues on which Black grounds her disability claim were diagnosed or treated during the look back period.[24] Dr. Munnich diagnosed Black with cervical radiculopathy at least by September 20, 2019, AR at 2495, and that condition is documented throughout the look back period and beyond as discussed above in connection with the Unum Policy's pre-existing condition limitation. *See id.* at 2531 (Chiropractor Stein describing Black's symptoms as indicative of "indicative of acute radiculopathy and compression" during a December 24, 2019 visit); *id.* at 3911 (stating Dr. Donthineni's opinion that the cervical spine MRI completed in June 2020 seemed to indicate "a persistent radiculopathy").

Dr. Munnich noted Black's "[a]dhesive capsulitis of shoulder, left shoulder" and neck pain, and her history of "marked limitations in using neck and shoulders" in notes from October 25, 2019. *Id.* at 2541. Dr. Munnich also confirmed Black's EDS diagnosis by letter of December 20, 2019, which is supported by physical therapy notes from October 2019. *Id.* at 2235, 2539. Those physical therapy notes also indicate Black attributed her neck and shoulder pain to then existing conditions: "[m]y neck is hurting due to my scoliosis and my L shlder [*sic*] is still hurting due to my shlder [*sic*] injury." *Id.* at 2539. The notes further indicate left shoulder stiffness and weakness. *Id.* Chiropractor Stein also treated Black for "scoliosis and related issues," including neck and shoulder problems, during the look back period. *Id.* at 2528, 2530, 2531. In addition, the degenerative nature of Black's conditions – both before and after the January 2020 fall – is also documented throughout the record. Black was diagnosed in 2018 with a degenerative spine condition and multiple tears of her left rotator cuff and labrum. *Id.* at 3033, 3074-3075, 3973-3974. Dr. Donthineni interpreted a June 2020 MRI as indicating "moderate rotator cuff tendinosis as well as labrum changes, which appear to be degenerative changes." *Id.* at 3910. Dr. Isono likewise diagnosed Black's labral tear as degenerative. *Id.* at 2682. The degenerative nature of Black's neck and shoulder conditions would have persisted even absent the January 2020 fall. Accordingly, the Court finds that the first element of the Aetna plan's pre-

---

[24] As with the pre-existing condition limitation in the Unum Policy, the provision in the Aetna plan is conspicuous, and so the substantial cause/substantial contribution standard applies. *See Dowdy*, 890 F.3d at 808

United States District Court
Northern District of California

existing condition limitation is satisfied.

Turning to the second element of the Aetna plan's pre-existing condition limitation, Black received services for these conditions during the look back period as discussed above in connection with the Unum pre-existing condition limitation. The third and final element is also met. Black took drugs or medicines prescribed or recommended by a doctor for her conditions during the applicable look back period – September 1, 2019 through November 30, 2019 – as discussed above in connection with the Unum pre-existing condition limitation.

Accordingly, the Court finds that all three elements of the Aetna pre-existing condition limitation are met, by a preponderance of the evidence, such that Black is not entitled to LTD benefits under the Aetna plan. Having determined that Black's neck and shoulder problems constitute pre-existing conditions under both plans, the Court does not reach the issue of whether those conditions were disabling.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Unum's motion for judgment and **DENIES** Black's cross-motion for judgment.

**IT IS SO ORDERED.**

Dated: August 13, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**